UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| SCOTT C. THERRIEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 06-31-B-W |
| | ) | |
| TOWN OF JAY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Scott C. Therrien brings an action under 42 U.S.C. § 1983 against police officer Stephen J. Gould, alleging that the officer used excessive force in effecting his arrest by taking him down to the ground and by kicking and beating him unconscious while he was on the ground.[1]  Concluding that, under *Saucier v. Katz*,[2] Officer Gould's initial takedown of Mr. Therrien was objectively reasonable under the circumstances, the Court grants the Officer's motion for summary judgment on that portion of the claim.  However, as regards the allegations of a post-arrest beating, the Court, with considerable misgivings, concludes that viewing the evidence in the light most favorable to Mr. Therrien, he has survived – but just barely – the Officer's dispositive motion.

---

[1] Plaintiff's initial complaint was against a host of Defendants and has since been distilled to a dispute against only Officer Gould.  Although he initially brought both a section 1983 claim and a state law battery claim, he has decided to proceed only with the federal claim.  *See Pl.'s Supplemental Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.*  at 1 (Docket # 32).
[2] 533 U.S. 194 (2001).

## I. STATEMENT OF FACTS[3]

On February 27, 2004, Scott Therrien and Roger Baldridge were drinking at Ma Ducks Bar in Jay, Maine.[4] *Def.'s Statement of Material Facts* ¶ 19 (Docket # 25) (DSMF); *Pl.'s Opposing Statement of Material Facts* ¶ 19 (Docket # 26) (POSMF). Mr. Baldridge had driven his pickup truck to Ma Duck's; Mr. Therrien was his passenger. DSMF ¶ 20; POSMF ¶ 20. They spent approximately ninety minutes at Ma Ducks and left around 7:30 p.m. DSMF ¶ 31; POSMF ¶ 31. Prior to his arrest shortly thereafter, Mr. Therrien had consumed five Budweiser beers. DSMF ¶ 26; POSMF ¶ 26. Before leaving for Ma Ducks, Mr. Baldridge had consumed a mixed drink and, while there, had four beers and a shot of alcohol. DSMF ¶ 27; POSMF ¶ 27. Mr. Therrien admits he was intoxicated and should not have been driving, but insists Mr. Baldridge was not intoxicated. DSMF ¶¶ 28-29; POSMF ¶¶ 28-29. Mr. Baldridge admits he was intoxicated and should not have been driving. DSMF ¶ 30; POSMF ¶ 30.

After leaving the bar, with Mr. Baldridge driving, the pair traveled south towards Livermore Falls. DSMF ¶ 32; POSMF ¶ 32. While en route, Mr. Baldridge was stopped and confronted by an individual concerned about his driving. DSMF ¶ 33; POSMF ¶ 33. Mr. Baldridge and Mr. Therrien switched seats after the confrontation. DSMF ¶ 34; POSMF

---

[3] Plaintiff objects to Defendant Gould's entire statement of material facts for failure to comply with Local Rule 56(b) which requires a "short and concise" statement of facts. *Pl.'s Opposing Statement of Material Facts* at 1 n.1 (Docket # 26) (POSMF). The Court finds no violation of the Local Rule and Plaintiff's objection is overruled. On the other hand, Officer Gould objects to Mr. Therrien's additional statements of material fact at paragraphs 129 and 140, because they fail to contain a record citation in violation of Local Rule 56(d). The Court sustains Officer Gould's objection, since those paragraphs fail to comply with the local rule. *See Pew v. Scopino*, 161 F.R.D. 1 (D. Me. 1995). The Court has not considered Mr. Therrien's statements of material fact 129 and 140.

[4] Plaintiff was working as a welder at the International Paper Mill in Jay, Maine. *Def.'s Statement of Material Facts* ¶ 2 (Docket # 25) (DSMF); POSMF ¶ 2. Roger Baldridge was a co-worker and fellow welder at the mill. DSMF ¶ 3; POSMF ¶ 3. Mr. Baldridge came to Maine to work specifically at the Jay Paper Mill. DSMF ¶ 4; POSMF ¶ 4. Mr. Baldridge was living with Mr. Therrien and his wife. DSMF ¶ 5; POSMF ¶ 5.

¶ 34.  Although his license was under suspension, Mr. Therrien continued driving the pickup truck until he was stopped and arrested in Jay.[5]  DSMF ¶¶ 24, 35; POSMF ¶¶ 24, 35.

On the evening of February 27, 2004, Officer Stephen Gould was on patrol in Livermore Falls.[6]  DSMF ¶ 36; POSMF ¶ 36.  At approximately 7:45 p.m., the Jay Police Department dispatch radioed officers that a pickup truck was swerving from side to side and driving erratically through Livermore Falls.  DSMF ¶ 37; POSMF ¶ 37.  Officer Gould was patrolling in a marked police car in Livermore Falls and heard a call for assistance from Jay police officers involving a motorist who was refusing to stop for them.  DSMF ¶ 38; POSMF ¶ 38.  After spotting the vehicle driven by Mr. Therrien, Officer Gould joined two Jay police cruisers in pursuit.  DSMF ¶¶ 39-40; POSMF ¶¶ 39-40.  Officer Gould was third in line behind Jay police officers Jeffrey Fournier and Paul Mingo.  DSMF ¶ 41; POSMF ¶ 41.

During the pursuit, Officer Jeffrey Fournier went in front of Mr. Therrien in an attempt to force an end to the low speed chase.  DSMF ¶ 46; POSMF ¶ 46.  Mr. Therrien attempted to pass Officer Fournier's cruiser, but Officer Fournier prevented him from doing so.  DSMF ¶ 47; POSMF ¶ 47.  Mr. Therrien then stopped the vehicle and Officers Fournier and Mingo left their cruisers to approach the truck.  DSMF ¶ 48; POSMF ¶ 48.  With Officers Fournier and Mingo out of their vehicles, Mr. Therrien drove off, evading the officers by going into a ditch and up a snow bank.  DSMF ¶¶ 49-50; POSMF ¶¶ 49-50.

Officer Gould, who remained in his vehicle, immediately followed Mr. Therrien. DSMF ¶ 51; POSMF ¶ 51.  Now Officer Gould was the only vehicle immediately pursuing

---

[5] In partial exchange for his living arrangement with the Therriens, Mr. Baldridge had agreed to use his pickup truck to transport him to work. Before the police stop, Mr. Baldridge was aware that Mr. Therrien did not have a license and could not drive. Mr. Baldridge later claimed he did not know Mr. Therrien did not have a license. DSMF ¶¶ 6-8; POSMF ¶¶ 6-8.

[6] Stephen Gould is a member of the Livermore Falls Police Department and has been in law enforcement for eighteen years, most of that time at the Livermore Falls Police Department.  DSMF ¶¶ 9-10; POSMF ¶¶ 9-10.

Mr. Therrien.  DSMF ¶ 53; POSMF ¶ 53.  Officers Fournier and Mingo back-tracked to the intersection where they expected to encounter Mr. Therrien and Officer Gould.  DSMF ¶¶ 52, 54; POSMF ¶¶ 52, 54.  Officer Gould continued the pursuit until Plaintiff stopped the truck, at which time he radioed that the vehicle stopped.  DSMF ¶¶ 55-56; POSMF ¶¶ 55-56.  Officer Gould did not know where Officers Fournier and Mingo were at the time of the stop.  DSMF ¶ 58; POSMF ¶ 58.  On hearing that Officer Gould had the vehicle stopped, Officers Fournier and Mingo proceeded to the location of the stop.  DSMF ¶ 57; POSMF ¶ 57.

For his own safety and consistent with his training, as Officer Gould came upon the stopped vehicle, he placed his vehicle in a "felony stop" position, at an angle and in front of Plaintiff's vehicle.  DSMF ¶¶ 62-64; POSMF ¶¶ 62-64.  This position commonly requires the officer to use a different approach to the vehicle other than that normally used in a traffic stop; however, the circumstances surrounding the stop dictate what is required of a police officer.  DSMF ¶¶ 65-66; POSMF ¶¶ 65-66.  Here, Officer Gould left his vehicle and drew his weapon because the individuals had failed to stop and were likely under the influence.  DSMF ¶ 68; POSMF ¶ 68.  Officer Gould stood behind his police car with his weapon drawn and ordered Mr. Therrien to show his hands.  *Pl.'s Statement of Additional Material Facts* ¶¶ 128, 130 (Docket # 26) (PASMF); *Def.'s Reply to Pl.'s Additional Material Facts* ¶¶ 128; 130.[7] (Docket # 29) (DR).  Mr. Therrien made his hands visible to Officer Gould in accordance with his orders.  PASMF ¶ 130; DR ¶ 130.

---

[7] Defendant objects to Plaintiff's additional facts at paragraph 130, because "Plaintiff previously denied this fact at Defendant's Statement of Material Fact ¶ 78."  DR ¶ 130.  This is not correct.  In his statement of material fact at paragraph 78, Officer Gould stated:  "The Plaintiff eventually raised his arms in the air while inside the vehicle."  DSMF ¶ 78.  This paragraph followed two paragraphs that state that after Officer Gould demanded that both the Plaintiff and his passenger raise their hands and exit the vehicle, Mr. Baldridge complied, but Mr. Therrien did not.  DSMF ¶¶ 76, 77.  It precedes a paragraph stating that Officer Gould opened Mr. Therrien's door after he had failed to step out of the vehicle.  DSMF ¶ 79.  In this context, Officer Gould's use of the adverb "eventually" suggests a failure on Mr. Therrien's part to immediately comply, ultimately justifying Officer Gould's takedown.  Mr. Therrien was well within his rights to deny Defendant's Statement of Material

4

Officer Gould ordered the occupants to shut off the truck engine and remove the keys from the ignition.  DSMF ¶ 69; POSMF ¶ 69.  Because Officer Gould had ordered him to keep his hands in the air, Mr. Therrien did not turn the engine off.  DSMF ¶ 70; POSMF ¶ 70.  Mr. Baldridge reached over and turned the engine off.  DSMF ¶ 72; POSMF ¶ 72.  Officer Gould ordered the occupants to take the keys out of the ignition, which Mr. Baldridge did.  DSMF ¶ 75; POSMF ¶ 75.  Officer Gould demanded that Mr. Therrien raise his hands and exit the vehicle.  DSMF ¶ 76; POSMF ¶ 76.

Officer Gould left the area behind his police car, holstered his gun, and walked up to the vehicle.  PASMF ¶ 131; DR ¶ 131.  He would not have done so and would have stopped his approach to the vehicle if either occupant had moved his hands to where he could not see them.  PASMF ¶ 132; DR ¶ 132.  Officer Gould ordered Mr. Therrien to exit the vehicle with his hands up and Mr. Therrien complied with these instructions.  PASMF ¶¶ 133-134; DR ¶¶ 133-134.[8]  However, it seemed to Officer Gould that Mr. Therrien was taking a long time to exit the vehicle and it appeared to Officer Gould that Mr. Therrien was not immediately

---

Fact ¶ 78, due to the way it was phrased.  The Plaintiff's statement of material fact ¶ 130 reads: "In accordance with his orders, Therrien made his hands visible to Officer Gould."  PASMF ¶ 130.  Contrary to Officer Gould's objection, this statement is not the same as his statement of material fact ¶ 78.  The Court overrules Defendant's objection.

[8] Defendant objects to Plaintiff's additional statement of material facts in paragraphs 133 on the ground that Plaintiff had previously admitted the facts in question in Defendant's statements of material fact paragraph 76.  DR ¶ 133.  Defendant's statement of material fact 76 states:  "Officer Gould demanded that the driver Scott Therrien raise his hands and exit the vehicle slowly."  In response to paragraph 76, Mr. Therrien stated: "Plaintiff denies that he was told to get out of the vehicle 'slowly' but otherwise admits this statement."  POSMF ¶ 76.  Similarly, Defendant objects to Plaintiff's additional statement of material fact in paragraph 134 on the ground that Plaintiff had previously denied the facts in question in Defendant's statements of material fact paragraph 82.  Statement of material fact 82 states:  "Mr. Therrien was slow to comply with Officer Gould's requests to place his hands in the air."  In response to paragraph 82, Mr. Therrien stated:  "Plaintiff objects to the characterization that he was 'slow' to place his hands in the air.  Plaintiff complied with the order to place his hands in the air."  POSMF ¶ 82.  Plaintiff's additional statements of material facts paragraphs 133 and 134 read:  "After the stop, Officer Gould ordered Scott Therrien to exit from the vehicle with his hands up." and "Therrien complied with those instructions."  PASMF ¶¶ 133, 134.  The Court is unclear what the Defendant is objecting to.  But for the characterization of the speed of Mr. Therrien's response, Mr. Therrien admitted paragraph 76 and he failed to deny, and therefore, admitted paragraph 82.  Plaintiff's statements in paragraphs 133 and 134 are wholly consistent with his prior responses.  The Court overrules the Defendant's objections to paragraphs 133 and 134.

complying with his orders because he thought it was "funny."   PASMF ¶¶ 135-136; DR ¶¶ 135-136.   Mr. Baldridge, upon exiting the vehicle, got on the ground in response to Officer Gould's orders.  DSMF ¶ 100; POSMF ¶ 100.[9]

Except for a narrow area of critical disagreement, the parties  substantially agree to what occurred after Mr. Therrien exited the vehicle.[10]   Officer Gould made a split-second decision to take  Mr. Therrien down to the ground quickly and forcefully.  DSMF ¶ 93; POSMF ¶ 93.  Officer Gould took two steps toward Mr. Therrien and made contact.  DSMF ¶ 94; POSMF ¶ 94.  Officer Gould grabbed him by the left wrist, went to Mr. Therrien's left side, keeping him on the officer's right, and he executed a takedown maneuver placing Mr. Therrien's left arm behind his back and forcing him down.  DSMF ¶ 95-96; POSMF ¶ 95-96. Officer Gould recently learned this takedown technique at the Police Academy.  DSMF ¶ 97; POSMF ¶ 97.

The  major  areas  of  disagreement  are:  (1) the  number  of officers present when  Mr. Therrien and Mr. Baldridge exited the vehicle; (2) what else, if anything, happened when Mr.

---

[9] Citing his own deposition, Officer Gould's statement of material fact paragraph 100 reads:  "Officer Gould yelled for the passenger to get down on the ground, face down immediately, and the passenger complied quickly."  Mr. Therrien denied this statement of material fact, citing generally Mr. Baldridge's deposition at page 66.  POSMF ¶ 100.  Mr. Baldridge testified on page 66:  "Well, I got out – the police officer that was with me, he wasn't really that bad.  He was – you know, had a gun on me and everything, but when I got out and he told me to get on the ground, I got on the ground.  They put – he put handcuffs on me, and that's what I remember about me."  *Baldridge Dep.* at 66:8-13 (Ex. 1 Docket # 25).  There are some differences between Officer Gould's statement of material fact paragraph 100 and Mr. Baldridge's deposition testimony, but not enough to justify a general denial of the statement.  The Court accepts Officer Gould's statement of material fact paragraph 100 to the extent it is consistent with Mr. Baldridge's deposition testimony.
[10] One disagreement is whether Mr. Therrien was attempting to comply with Officer Gould's orders.  Mr. Therrien says that he had complied with Officer Gould's orders, except for the order to turn the truck engine off, since he could not do so and keep his hands in the air.  DSMF ¶ 70; POSMF ¶ 70.  Mr. Therrien also says that he was unable to get down on the ground as ordered by Officer Gould, because the officer quickly threw him to the ground the moment he got out of the vehicle.  PASMF ¶ 137; DR ¶ 137.  Officer Gould says that as he approached the vehicle, he noticed Mr. Therrien looking over at his passenger and smiling or snickering, that Mr. Therrien made a fist with both hands, that by a combination of looks and action between Mr. Therrien and Mr. Baldridge, he feared for his safety and thought he was going to be jumped, and that he then made the split-second decision to take Mr. Therrien to the ground.  DSMF ¶¶ 89-93.  Mr. Therrien has denied each of these statements of material fact, except that he admits it took only about a second for the officer to put him on the ground.  POSMF ¶¶ 89-93.

Therrien was on the ground and who, if anyone, did it; and, (3) what injuries Mr. Therrien sustained as a result.  First, Mr. Therrien and Mr. Baldridge claimed that at least three officers were present at the scene when they got out of the truck.  DSMF ¶ 116; POSMF ¶ 116.  They further claimed that all the police officers had their guns drawn and pointed at them.  DSMF ¶ 117; POSMF ¶ 117.  Second, Mr. Therrien claims that when he was on the ground he received blows, kicks, and/or punches from at least two other officers.  DSMF ¶ 118; POSMF ¶ 118; PASMF ¶ 138; DR ¶ 138.  Officer Gould contends that he was the only officer on the scene until he had taken Mr. Therrien down and handcuffed both Mr. Therrien and Mr. Baldridge.  DSMF ¶ 100; POSMF ¶ 100.  Officer Gould denies punching or kicking Mr. Therrien when he was on the ground, but he admits that, in keeping with the police technique, he placed his knees on both sides of Mr. Therrien's shoulders so that he could not move.  DR ¶ 138; *Gould Dep*. at 40:16-23 (Ex. 4 Docket # 25).  Third, the parties agree that Mr. Therrien sustained facial abrasions, a broken tooth, a fat lip, and an inability to move his jaw.  PASMF ¶ 143; DR ¶ 143.  However, Mr. Therrien says that after he was taken down he also lost consciousness.  DSMF ¶ 110; POSMF ¶ 110.  He says that he recalls being struck two times while on the ground and that his next memory is being seated on the pavement leaning against the truck he had been driving.  DSMF ¶ 111; POSMF ¶ 111.  Mr. Therrien testified that once he was on the ground, he received blows, kicks, and/or punches from at least two other officers, whom he could not identify.  DSMF ¶ 118; POSMF ¶ 118.  He said he was knocked unconscious after the second blow.  DSMF ¶ 119; POSMF ¶119.  At the emergency room, Mr. Therrien was found to have a swollen lip, a fracture of the right upper incisor, some jaw tenderness, facial abrasions and contusions, and a chin laceration.  DSMF ¶ 103; POSMF ¶ 103; PASMF ¶ 144; DR ¶ 144.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "Once the movant avers an absence of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (internal citation omitted). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted). In applying this standard, the record is viewed in the light most favorable to the nonmoving party. *FDIC v. Anchor Props*, 13 F.3d 27, 30 (1st Cir. 1994).

### B. Count I: Excessive Force Pursuant to 42 U.S.C. § 1983

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" and, of course, protects individuals against the use of excessive force by police officers in carrying out an arrest. U.S. Const. amend. IV. Under the Fourth Amendment, a law enforcement officer may use "such force as is reasonably necessary to effect an arrest." *United States v. McQueeney*, 674 F.2d 109, 113 (1st Cir. 1982). In an excessive force case, the "threshold constitutional question is analyzed under the Fourth Amendment's objective reasonableness standard." *Whitfield v. Melendez-Rivera*,

431 F.3d 1, 7 (1st Cir. 2005).  The Supreme Court has established "a balancing test for determining whether a particular exercise of force is constitutional:  'Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.'" *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 148 (1st Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  In *Saucier*, the Supreme Court wrote,

> Because "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation," the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective. We set out a test that cautioned against the "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene.

*Saucier*, 533 U.S. at 205 (quoting *Graham*, 490 U.S. at 393, 396, 397); *see also Jennings v. Jones*, No. 05-2522, 2007 U.S. App. LEXIS 5268, at *24 (1st Cir. Mar. 7, 2007).  The Court went on:

> *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim, "requiring careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.

*Saucier*, 533 U.S. at 205 (quoting *Graham*, 490 U.S. at 396).  Nevertheless, it is equally clear that the use of excessive force in carrying out an arrest may violate the Fourth Amendment's prohibition against unreasonable seizures of the person.  *See Graham*, 490 U.S. at 395;

9

*Kaluzynski v. Armstrong*, No. 00-267-B-S, 2001 U.S. Dist. LEXIS 11040, *11 (D. Me. May 16, 2001).

### C. Officer Gould's Takedown of Mr. Therrien

The Court easily concludes that Officer Gould is entitled to summary judgment on his decision to take Mr. Therrien down to the ground.  Mr. Therrien's actions up to the point he was taken down are simply egregious and Officer Gould was fully justified in quickly and forcefully placing him on the ground.  Mr. Therrien had led a parade of police vehicles on a low speed chase through the towns of Jay and Livermore Falls.  Despite the obviousness of police sirens and flashing blue lights, he had simply driven on, swerving over the road and endangering the public.  Mr. Therrien offers no excuse for his actions and there is none.[11] His obvious inability to control his vehicle and his persistent failure to stop would amply permit a reasonable officer to conclude that the operator of the vehicle was seriously impaired and resistant to authority.  This hazardous situation escalated when, at one point in the chase, Mr. Therrien stopped for the officers, but immediately drove off after two of the officers had gotten out of their cruisers to approach him; Mr. Therrien actually drove into a ditch and up a snow bank before proceeding down Quarry Road, a side road.  Mr. Therrien's irrational actions at that point set the stage for Officer Gould's response and reinforced the conclusion that he was seriously impaired, resistant to authority, and wholly unpredictable.

When Mr. Therrien finally decided to stop on the Quarry Road, Officer Gould was the only officer present.  Officer Gould knew that:  (1) Mr. Therrien had led the officers on a prolonged chase; (2)  Mr. Therrien was likely seriously impaired or intoxicated; (3)  Mr. Therrien had acted in an irrational and unpredictable fashion in resisting a police stop; (4)

---

[11] Mr. Therrien admits he "was very, very wrong" not to stop and that he "was not thinking clearly" that night. DSMF ¶ 43; POSMF ¶ 43.

there were two occupants of the vehicle; and, (5) Officer Gould was alone but that the other officers were proceeding to the scene.[12]  But, given the circumstances surrounding the stop, Officer Gould did not know:  (1) whether Mr. Therrien would, as he had before, speed off and continue to resist police authority; (2) whether the passenger, Mr. Baldridge, was in cahoots with Mr. Therrien, or merely a passive occupant; (3) whether either Mr. Therrien or Mr. Baldridge was carrying a weapon; and, (4) when the other officers would arrive at the scene.  Finally, Officer Gould was approaching the occupants of this vehicle on a remote side road in rural Maine in the darkness of winter.

Even assuming that Mr. Therrien had fully complied with Officer Gould's directives, in view of the egregious circumstances that Mr. Therrien had precipitated, Officer Gould exerted such force as was necessary to effect the arrest in quickly and forcefully taking Mr. Therrien to the ground.   Yet, Mr. Therrien takes the position that because he had finally decided to surrender peacefully and without resistance, the officer violated his constitutional rights in doing so.  He likens his claim to the Court's recent decision in  *Smith v. Jackson*, 463 F. Supp. 2d 72 (D. Me. 2006).  The Court disagrees.  In *Smith*, according to a third party witness, who observed the event, Mr. Smith was highly intoxicated, sitting on the front steps of a house, surrounded by three officers, and was not acting at all aggressively or provocatively.  *Id.* at 74-75.  The officers began to poke fun at his intoxicated state and to persist in antagonizing him.  *Id.* at 75.  One of the police officers handcuffed Mr. Smith, grabbed him, violently wrenched him off the stairs with so much force that his whole body went up into the air, and threw him face first onto the cement pad in front of the stairs.  *Id.*

---

[12]  The Court explains later the basis of its decision that, even when viewing the evidence in the light most favorable to the Plaintiff, the evidence compels the conclusion that Officer Gould was alone at the scene when he took Mr. Therrien down.

When Mr. Smith complained that he had broken his nose, the officers laughed and denied throwing him down, claiming falsely that he had tripped. *Id.*

The facts in *Smith* are markedly dissimilar to what Officer Gould confronted the evening of February 27, 2004.  Mr. Therrien was not sitting peacefully on a front step surrounded by officers, but had actively led officers on a prolonged chase through two local towns.  Regardless of whether Mr. Therrien had made an internal decision to surrender, Officer Gould was in no position to mind-read Mr. Therrien's true intentions as he exited the vehicle.  Despite Mr. Therrien's current protestations that he had finally resolved to stop his perilous nonsense and act sensibly, Officer Gould was fully justified in relying on what Mr. Therrien had already done that evening.  Judging Officer Gould's actions from an on-scene perspective, the Court concludes that, in taking Mr. Therrien to the ground, Officer Gould used an amount of force reasonably necessary to effect Mr. Therrien's arrest; to the extent the officer's actions were more forceful than necessary, they were based on a reasonably mistaken belief, resulting from Mr. Therrien's prior conduct that evening.[13]  The Court grants Officer Gould's motion for summary judgment as to any injuries Mr. Therrien sustained as a consequence of the takedown.

---

[13] The wisdom of Officer's Gould's action is buttressed by the contents of the emergency room records later that night.  Ex. 2 *Therrien Aff.* (Docket # 26). The emergency room physician described Mr. Therrien as "intoxicated and hostile."  *Id*.  Although he consented to the basic examination, Mr. Therrien refused to allow the doctor to clean the laceration on his chin and take any x-rays of his jaw.  *Id.*  The doctor concluded that it was better to have Mr. Therrien return to the emergency room in three days when he could receive a "delayed primary closure . . . with good cleaning of the wound when he is more cooperative."  *Id.*  If Mr. Therrien displayed such hostility to a physician who was trying to treat him, there is no telling what he would have done to a police officer who was about to arrest him.

### D.  The Post-Takedown Assault

Mr. Therrien claims that after he was fully subdued, non-resistant, and lying face down on the ground, Officer Gould gratuitously beat him so viciously that he knocked him unconscious.  Taken at face value, these allegations, if credited, would ordinarily survive summary judgment, since the police action, at least as he would have them, cannot be characterized as objectively reasonable.  However, the record here presents serious doubts as to whether Mr. Therrien's version of the events can be credited.  The struggle is between the Court's obligation to view the evidence at this stage in the light most favorable to Mr. Therrien while, at the same time, not allowing Mr. Therrien to proceed in a case that is "unwinnable."  *McCarthy v. Northwest Airlines*, 56 F.3d 313, 315 (1st Cir. 1995).  The Court's obligation is only to draw reasonable inferences, "paying no heed to conclusory allegations, improbable inferences, [or] unsupported speculation."  *Id.* (internal punctuation and citation omitted).  Upon analysis, there is much here that is conclusory, improbable and unsupported; the question is whether there is enough left to survive summary disposition.

### 1.  The Number of Officers Present at the Time of Plaintiff's Arrest

One of the more disturbing aspects of Mr. Therrien's case is that it appears he has tailored his claim to fit the developing evidence.  An example is the number of officers he has claimed were at the scene when he finally stopped the vehicle and the number of officers who participated in the alleged beating.  Mr. Therrien and Mr. Baldridge initially testified during their depositions that when they exited the truck, there were at least three or more officers at the scene and that all officers had their guns drawn.  DSMF ¶¶ 116-117; POSMF ¶¶ 116-117.  Mr. Therrien also testified that once he was taken to the ground, he received blows, kicks and/or punches from at least two other officers and that, although he could not

identify the officers, he was knocked unconscious after the second blow. DSMF ¶¶ 118-119; POSMF ¶¶ 118-119. Even now, Mr. Therrien commands the court to accept his version of the events, however implausible: "In other words, the court must assume that the testimony of Plaintiff and Roger Baldridge is true – that the arrest and detention of Plaintiff was made by several officer with weapons drawn. Further, a jury could reasonably conclude that there was a conspiracy of silence among the officers to let one officer take all of the responsibility for the injuries sustained by plaintiff." *Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* at 2 n. 2 (Docket # 27).

This tale is simply not supported by the evidence as it has been developed, even when viewed in the light most favorable to Mr. Therrien. First, there is the videotape, submitted by Plaintiff, and taken from Officer Fournier's police cruiser. Ex. Video Tape (Docket # 26). The video begins with Officer Fournier following Mr. Therrien and signaling for him to pull over. It continues for some time with Mr. Therrien ignoring the cruiser's blue lights and siren and weaving along the road. After Mr. Therrien took a left hand turn, Officer Fournier proceeded in front of him. Officer Fournier traveled down a road and Mr. Therrien went out of sight. Suddenly, the Officer turned around and backtracked.

Mr. Therrien has admitted that Officer Fournier was the second officer to arrive at the scene. DSMF ¶ 105; POSMF ¶ 105. The videotape shows the scene as he drove up: Officer Gould's Livermore Falls police cruiser, parked at an angle, in front of what is later revealed to be a pickup truck. Although the cruiser was immediately in front of the camera and blocked some of the view, the videotape depicts only one officer at the scene when Officer

Fournier first arrived.[14]  Neither Mr. Therrien nor Mr. Baldridge is visible.[15]  Some time later, Officer Mingo arrived at the scene.  The videotape depicts a version of the events substantially contrary to the original version testified to by both Mr. Therrien and Mr. Baldridge.  Based on the contents of the videotape, it is simply impossible for Officer Fournier and Officer Mingo to have been present at the scene with firearms drawn when Mr. Therrien and Mr. Baldridge exited the truck; by contrast, the videotape reveals a scene entirely consistent with Officer Gould's contention that when he originally came upon Mr. Therrien and Mr. Baldridge, he was alone.

To further muddle the matter, Mr. Therrien seems to attempt to negotiate the truth or falsity of his responses on this point to Officer Gould's statement of material facts.  The Defendant's statement of material fact number 104 says:  "No other law enforcement officer was present until after Officer Gould had handcuffed both Therrien and his passenger."  DSMF ¶ 104.  Mr. Therrien makes a curious response:  "Plaintiff denies this statement.  *However, assuming Officer Gould remains willing to accept all responsibility for the injuries sustained by Scott Therrien, he will not contest the statement for purposes of this motion*."  POSMF ¶ 104 (emphasis supplied).  This is an inappropriate response and violates the letter and spirit of the local rules.  Under the rules, Mr. Therrien may admit the statement, deny the statement, or qualify his response.  Local Rule 56(c).  But, he may not deny the fact, subject to the opposing party's willingness to admit another unrelated fact.  Responses to statements of material fact are not the proper place to negotiate the truth or falsity of the evidence.

---

[14] It is a logical inference that the sole officer visible at the scene was Officer Gould, since the cruiser blocking the pickup is clearly marked as a Livermore Falls police cruiser and the other two officers were employed by the town of Jay.

[15] That neither was visible seems consistent with being on the ground and handcuffed.

In fact, however, it is not just the testimony of Officer Gould that suggests that he was the only officer present when Plaintiff was arrested. Defendant states, and Plaintiff admits, that the second police officer to arrive on the scene was Jay police Officer Fournier, that Officer Mingo was the third police officer to arrive at the scene of the arrest, that Deputy Sheriff Nathan Bean, who had been approximately ten miles away and was radioed as backup, was the fourth police officer to arrive at the scene; and that State Trooper Derek Record, who was also radioed as backup, was the fifth law enforcement officer to arrive at the scene. DSMF ¶¶ 105, 107-109; POSMF ¶¶ 105, 107-109. The deposition testimony of all four officers reflects the same. *Fournier Dep*. at 24: 25; 25: 1-3 (Ex. 3 Docket # 25); *Mingo Dep*. at 12: 24-25; 25: 1-2 (Ex. 5 Docket # 25); *Bean Dep*. at 17: 6-11 (Ex. 2 Docket # 25); *Record Dep*. at 7: 13-18 (Ex. 6 Docket # 125).

In addition, some of Mr. Therrien's own material facts are consistent with the presence of only Officer Gould at the initial stop. In paragraph 128, Mr. Therrien states that Officer Gould had his weapon drawn as he was giving orders from behind his patrol car. PASMF ¶ 128. He asserts that because there were other patrol cars involved in the "slow speed chase," Officer Gould knew that there was back-up in the vicinity of the stop. PASMF ¶ 129. Once out of the car, Mr. Therrien says he was unable to comply with Officer Gould's instruction to get on the ground because Plaintiff was violently thrown to the ground. PASMF ¶ 137.

It may be that Plaintiff has now reluctantly accepted the notion that only one officer was present at the time of his arrest. In his affidavit, Plaintiff states, "While I firmly believe that other officers were involved in my arrest, I am willing to accept Officer Gould's testimony that he was the only officer who utilized force to arrest me." *Pl.'s Aff*. ¶ 5 (Ex. 1.

Docket # 26).[16]  But, as noted, in his memorandum, Mr. Therrien continues, even now, to insist that the Court is compelled to accept anything he says on this point, simply because he says it.

Still, there is simply no probative evidence for Plaintiff's original contention that anyone other than Officer Gould was present when he exited his vehicle and no probative evidence for his contention that he was beaten by several officers.  What makes all this most troubling is that Mr. Therrien's original version of the events conjures up a vivid image of a police force running amok with a small cadre of officers mercilessly beating a defenseless, intoxicated man to the point of unconsciousness.  This tale, however, is demonstrably untrue and it casts a pall over the accuracy of Mr. Therrien's remaining allegations.  Once his initial version has been proven false, Mr. Therrien, while continuing to press its accuracy, retreats to the fallback position that it must have been only Officer Gould who beat him, an allegation which – absent similar demonstrable contradictory evidence – simply places his word against the officer's; in other words, allegations typically sufficient to generate a jury question.

### 2.  Plaintiff's Alleged Loss of Consciousness and Injuries Sustained

If Mr. Therrien had sustained injuries consistent with kicks and punches, his case would have some causal consistency.  Mr. Therrien says that as a consequence of the assault, he suffered physical injuries consistent with such a thrashing and he ultimately was beaten into unconsciousness.  One test of the accuracy of his account is whether the histories and physical examinations of Mr. Therrien later that night at the emergency room are consistent with this story.  They are not.

---

[16] Mr. Therrien's conclusion is also consistent with his decision to agree to a stipulation of dismissal with prejudice of all of the other individual police officer defendants.  *Stipulation* (Docket # 21).

First, the original history fails to mention either any beating, any loss of consciousness, and any discrete injuries attributable to the beating as opposed to the takedown:

> The story that I am told is that he was pulled over and then refused to show his hands when the officer approached the car and so he was "taken down." The patient is intoxicated and apparently did not have protective reflexes when he is falling and so his face came against the gravel or tar.
>
> There is a laceration under the chin. There is an abrasion over the right zygomatic arch. The patient was not knocked unconscious and has not been vomiting. Motor exam is grossly intact. There is no other injury reported. The remaining review of systems is negative.

*Emergency Department Report*, Ex. 2 *Therrien Aff.* (Docket # 26).

The same is true of the physical examination:

> Pupils are equal and reactive and extraocular muscles appear intact. The upper lip is swollen but the inside of the lip does not show laceration that I would need to close. Dentition appears to be in place. There is no lingual injury. There is an abrasion over the zygomatic arch but there is no depression and clinically I doubt fracture. Extraocular muscles are intact. There is no evidence of entrapment. The orbits are stable bilaterally and I do not see any evidence for orbital fracture. Tympanic membranes show no hemotympanum. I do not see any other abrasion or scalp laceration.
>
> Cervical spine is nontender and the patient has been moving his spine vigorously all night. Thoracic and lumbar spines are nontender to palpation. Rib skeleton stable to pressure and rocking. There is a chin laceration that the patient is essentially refusing to allow cleaning or any further attention to it and I think that this would be a lost cause to try to close this primarily tonight . . . .

*Id.* The remainder of the examination was normal. His abdomen was soft and nontender; his extremities showed no significant injury; and his neurological examination was grossly normal other than his intoxication. *Id.*

18

Mr. Therrien returned to the ER for reevaluation later that same night.[17]   The ER doctor took another history:

> He seems to be much more sober and cooperative and is complaining of essentially the same pains that he had before of the right-sided facial abrasions and contusions, a fat lip and a broken tooth.  He also says that he "can't hardly move my jaw" and is requesting mandible films.

*Emergency Department Report*, Ex. 3 *Therrien Aff.* (Docket # 26).  The doctor's findings during the second examination were consistent with his original findings.

Mr. Therrien's current claim that, after he was taken to ground, he was beaten and kicked to unconsciousness is not corroborated by the medical evidence.  First, neither of the medical histories – the first having been taken immediately after the incident and the second later that evening – mentions being kicked, punched, or beaten.  Even if the officers provided some of the first history, it is equally clear that the doctor spoke directly to Mr. Therrien on both occasions.   At no point did Mr. Therrien inform the physician of what he is now informing the Court and; in fact, Mr. Therrien expressly assured the physician that he "was not knocked unconscious," directly contradicting what he now insists occurred.

Second, the medical examinations reveal only injuries to the front and side of his face – injuries wholly consistent with the takedown.  If he was brutally kicked and punched to the point of unconsciousness while lying face down, it is passing strange that the physical evidence of his injuries is restricted to the front of his face, the right side of his chin and jaw, and the area just above his right cheek.  By contrast, his neck, low and mid-back, ribs, arms, legs, and scalp were entirely normal and the physician found no evidence of any other

---

[17] Although not in the statements of material fact, the Court was curious why Mr. Therrien returned to the ER later that same night after being told by the ER physician to return in three days.  It seems that after he left the ER and went to the police station, his wife came and bailed him out.  She then took him back to the ER by which time, he was apparently much more subdued.  *Therrien Dep.* at 131:14-23.

injuries.  It is simply inexplicable that there is no physical evidence of the allegedly brutal attack.[18]  In sum, the medical evidence here cuts across Mr. Therrien's claim that Officer Gould beat and kicked him to the point of unconsciousness.

### 3.  Lack of Corroboration

Other than Mr. Therrien's testimony, there is no corroborating evidence that he was beaten after the takedown.  During the videotape, Mr. Therrien can be heard volubly complaining that he had been given a "fat lip," but he makes no accusation of being beaten or kicked.  Moreover, although Mr. Baldridge corroborated the claim that three officers had stopped them with weapons drawn, Mr. Baldridge testified that he did not see any officers striking Mr. Therrien.[19]  DSMF ¶ 120.

### 4.  An Implication of Witness Manipulation

More distressing still is that Mr. Baldridge's deposition testimony strongly suggests that Mr. Therrien contacted Mr. Baldridge before his deposition and attempted to influence his testimony.  Defendant states:

> At his deposition . . . Mr. Baldridge testified he had talked with [Plaintiff] at least three (3) times in August. Before his deposition, Mr. Baldridge had a number of telephone calls from [Plaintiff] and was asked specific questions about the incident by [Plaintiff].  Before his deposition, Mr. Baldridge believed that [Plaintiff] was trying to steer his (Baldridge's) testimony in a particular direction. [Plaintiff] used the phrase "don't be telling anyone" in referenced (sic) to certain aspects of the testimony. [Plaintiff] told Mr. Baldridge that the lawsuit "would be one of the best shutdowns that I ever been on . . . ."

---

[18] At Mr. Therrien's request, the emergency room doctor took photographs of Mr. Therrien's face.  Exs. 1-3 (Docket # 26).  The photographs reveal injuries consistent with the doctor's description but no additional injuries.  Had Mr. Therrien actually sustained additional injuries, it is only sensible that he would have had the doctor photograph those as well.

[19] Plaintiff qualifies this statement to say that Mr. Baldridge was not in a position to see what was occurring. POSMF ¶ 120.  Be this as it may, it remains implausible that Mr. Baldridge lying on the ground on the other side of the truck would have been wholly unaware of an assault so brutal that it caused Mr. Therrien to lose consciousness.  Mr. Baldridge otherwise testified that he only heard Mr. Therrien say "Ouch" and "Ahh" a few times, but never heard anything that would have caused him to say "Ouch."  *Baldridge* at 45:10-25; 46:1-4.

> Mr. Baldridge understood that reference to "shutdown" as a
> term in the welding trade meaning an opportunity to make a lot
> of money.

DSMF ¶¶ 121-126.[20]

### 5.  Discussion

The Court addresses Officer Gould's motion for summary judgment under the substantial constraint imposed by Rule 56:  it must deny the motion unless the officer demonstrates that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the First Circuit has reiterated, the court must "take as true the facts documented in the record below, resolving any factual conflicts or disparities in favor of the nonmovant."  *Calvi v. Knox County*, 470 F.3d 422, 426 (1st Cir. 2006).  The Court must "draw all reasonable inferences from the assembled facts in the light most hospitable to the nonmovant."  *Id.*  At the same time, *Calvi* remonstrated that demonstrating a trialworthy issue "requires more than the frenzied brandishing of a cardboard sword.  As we have warned, a conglomeration of conclusory allegations, improbable inference, and unsupported speculation is insufficient to discharge the nonmovant's burden."  *Id.* (internal punctuation and citations omitted).

Based on the evidence in this record, the Court has profound misgivings about Mr. Therrien's veracity.  His voice stands alone against a mountain of contradictory evidence.  If this were a trial submitted on the basis of a stipulated record, the Court would without hesitation issue a verdict in favor of Officer Gould.  But, boiled to its essence, the Court's unease is bottomed on its evaluation of Mr. Therrien's credibility.  Despite the convincing nature of Defendant's case, the Court cannot grant summary judgment, when one party

---

[20] Plaintiff objects to paragraphs 121 through 126 as irrelevant.  POSMF ¶¶ 121-126.  Plaintiff's objections are overruled.

swears something happened and the other swears it did not.  As Justice Ginsburg wrote in concurrence:

> Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official.  And that is as it should be.  When a plaintiff proffers evidence that the official subdued her with a chokehold even though she complied at all times with his orders, while the official proffers evidence that he used only stern words, a trial must be had.

*Saucier*, 533 U.S. at 216 (Ginsburg, J., concurring); *see also Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) ("Miller contends that either Smith or Brower (with Dunn nearby) smacked him around while he lay cuffed on the ground. . . .  Since he alleges facts to support these claims, they should not have been dismissed."); *Burbank v. Davis*, 227 F. Supp. 2d 176, 188 (D. Me. 2002) ("Whether Burbank can ultimately prevail on this claim will depend of whose story the fact-finder credits.").

The Court is not at all convinced that this result is "as it should be."  The First Circuit has counseled that summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources."  *McCarthy*, 56 F.3d at 315.  This case seems to fit that bill.  At the least, it seems counterproductive to hold a jury trial on such slim evidence and unfair to retain Officer Gould as a defendant on Mr. Therrien's say so alone.  But, ultimately, Mr. Therrien has a Seventh Amendment right to trial by jury to resolve credibility issues and it remains for a jury, not the Court, to render a just verdict.

## III. CONCLUSION

The Court GRANTS the Motion for Summary Judgment (Docket # 24) on Count I of the Complaint to the extent it asserts a claim for damages from Officer Gould's initial

takedown, but DENIES the motion to the extent it asserts a claim for damages from Officer Gould's alleged subsequent assault.[21]

   SO ORDERED.

          /s/ John A. Woodcock, Jr.
          JOHN A. WOODCOCK, JR.
          UNITED STATES DISTRICT JUDGE

Dated this 6th day of April, 2007

---

[21] Officer Gould requested summary judgment on Mr. Therrien's punitive damage claim as well. The punitive damages standard in a § 1983 action is whether the defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Bisbal-Ramos v. City of Mayaguez*, 467 F.3d 16, 25 (1st Cir. 2006). The requirement of reckless indifference means that the defendant must act "in the face of a perceived risk that [his] actions will violate federal law." *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 536 (1999); *Bisbal-Ramos*, 467 F.3d at 25. Once the plaintiff has adduced sufficient probative evidence to meet this standard when the evidence is viewed in the light most favorable to him, this evidence "should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages." *Smith*, 461 U.S. at 51. Since the survival of Mr. Therrien's underlying claim assumes his ability to prove that he was brutally assaulted and severely beaten while lying helpless on the ground, the punitive damages claim must survive as well.